UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| SHARON ELAINE COCKFIELD, | ) | Civil Action No.: 4:05-0277-TLW-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| SOUTH CAROLINA DEPARTMENT | ) | |
| OF PUBLIC SAFETY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Plaintiff filed this action in the Horry County Court of Common Pleas, and it was subsequently removed to this Court on January 27, 2005. She alleges causes of action for race and gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1965, race discrimination in violation of 42 U.S.C. § 1981 and breach of contract. Presently before the Court is Defendant's Motion for Summary Judgment. (Document # 31).

## FACTS

Plaintiff is a white female who was hired by Defendant in 1987 to work in Horry County as a trooper for the South Carolina Highway Patrol. Plaintiff Dep. at 6, 8-9. After serving eighteen months as a trooper, Plaintiff was promoted to Senior Trooper. Id. at 9. Approximately one year later, Plaintiff was promoted to Trooper First Class. Id. Plaintiff worked as a Trooper First Class for around five years and was then promoted to Lance Corporal. Id. at 11. Two and a half years after being promoted to Lance Corporal, Plaintiff was promoted to Corporal, in which position she remained until June 1999. Id. at 11-12. In June 1999, Plaintiff was promoted to her current position, Sergeant. Id. at 12-13.

Plaintiff alleges that she has been denied several promotions based upon her race and gender. In October of 2001, Plaintiff applied for three different Lieutenant positions. Plaintiff Dep. at 13-14.

Melvin Warren, a black male, and James Harrelson and David Jordan, both white males, were selected to fill those positions, each through a separate selection process. Id. at 14, 36. Plaintiff applied for another Lieutenant position in December of 2002. Id. at 14. Darnell Kelly, a black male, was awarded the position. Id. In March of 2003, Plaintiff applied for another Lieutenant position, which was awarded to Jo-Nathan Nell, a black male. Id. In January of 2004, Plaintiff applied for a First Sergeant position that was ultimately awarded to Farrell Scott, a black male. Id.

Plaintiff also alleges that other adverse employment actions were taken against her by Captain (now Major) Melvin Howard, a black male, as a result of her race and/or gender. According to Plaintiff, Howard altered her Management Leadership Assessment (MLA) form during the October 2001 promotion process to give her a lower rating than she was originally given by her immediate supervisor. In addition, Plaintiff was removed from the South Carolina Highway Patrol Hiring Board approximately seven or eight years ago, the South Carolina Highway Patrol Promotion Boards approximately six years ago, and the Georgia Highway Patrol Promotions Board.[1] Id. at 54-57, 82-90; Plaintiff Affidavit at ¶¶ A-C. Plaintiff asserts that Howard took away her command post position for the Atlantic Beach Bikefest in May of 2002 and her access to the Internet Routed Information System (IRIS) about a year and a half after he became Captain in 2001. Plaintiff Dep. at 82-91; Plaintiff Affidavit at ¶¶ N-O.

Plaintiff filed a Charge of Discrimination against Defendant with the South Carolina Human Affairs Commission (SCHAC) and the Equal Employment Opportunity Commission (EEOC) on April 13, 2003, in which she challenged the December 2002 and March 2003 promotion decisions. Plaintiff Dep. at 163, 64 and Ex. 1. SCHAC issued a "no cause" determination and the EEOC

---

[1]The record is unclear as to when Plaintiff was removed from the Georgia Highway Patrol Promotions Board, but, as discussed below, Defendants note that this alleged adverse employment action is not time-barred.

2

adopted the findings of SCHAC and issued a dismissal with a right to sue letter on September 26, 2003. Id. at 164 and Ex. 3 and 4.

On July 1, 2004, Plaintiff filed a second Charge of Discrimination with SCHAC and the EEOC. Id. at 169 and Ex. 5. In the second charge, Plaintiff challenged the January 2004 promotion decision, and her removal from IRIS, the Georgia Highway Patrol Promotions Board, the South Carolina Highway Patrol Hiring Board, the South Carolina Highway Patrol Promotion Boards, and the command post at the Atlantic Beach bikefest. Id. The EEOC issued a dismissal and right to sue letter on September 27, 2004. Id. at 169 and Ex. 7.

Plaintiff further claims that Captain Howard retaliated against her for filing the second EEOC charge by issuing a Level One Reprimand against her in September of 2005 for failing to inspect a wrecker service within a sufficient amount of time. Plaintiff Dep. at 100, 110-15; Plaintiff Affidavit at ¶ V.

Plaintiff filed the present action on December 22, 2004. In her complaint, she asserts causes of action for race and gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1965, race discrimination in violation of 42 U.S.C. § 1981 and breach of contract

## DISCUSSION

### *Summary Judgment Standard*

The moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), FRCP; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Celotex, 477 U.S. 317. Once the moving party has brought into question whether there is a genuine issue for trial on a

material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine issue for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

Rule 56(e) provides, "when a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." See also Celetex Corp. v. Catrett, 477 U.S. 317, 324 (1986)(Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves"). To raise a genuine issue of material fact, a party may not rest upon the mere allegations or denials of his pleadings. Rather, the party must present evidence supporting his or her position through "depositions, answers to interrogatories, and admissions on file, together with ... affidavits, if any." Celetex Corp. v. Catrett, 477 U.S. 317, 322 (1986). See also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

*Title VII Claims*

The majority of Plaintiff's Title VII claims are procedurally barred. First, Defendant argues that Plaintiff has failed to exhaust her administrative remedies as to her claim of retaliation based on the Level One reprimand that she received in September of 2005 for failing to inspect a wrecker service within a sufficient amount of time. Before a plaintiff has standing to file suit under Title VII, she must exhaust her administrative remedies by filing a charge with the EEOC. See Smith v. First Union Nat'l Bank, 202 F.3d 234, 247 (4th Cir. 2000). The EEOC charge defines the scope of the plaintiff's right to institute a civil suit. Id. "An administrative charge of discrimination does not strictly limit a Title VII suit which may follow; rather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination." Chisholm v. United States Postal Serv., 665 F.2d 482, 491 (4th Cir. 1981).

The scope of a private action is defined by the scope of the administrative charge from which it arises and from any findings that arise out of the investigation of the charge. EEOC v. General Elec. Co., 532 F.2d 359, 365 (4th Cir. 1976). Therefore, only those claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent lawsuit. Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 962-63 (4th Cir. 1996) (sexual harassment and discriminatory pay and benefits claims dismissed because EEOC complaint alleged only a failure to promote); Dennis v. County of Fairfax, 55 F.3d 151, 156-57 (4th Cir. 1995) (hiring, promotion, and training discrimination claims dismissed where EEOC charge alleged only discriminatory discipline).

Plaintiff asserts that she seeks redress only for the retaliation that occurred after she filed her second EEOC complaint and, thus, she was not required to file a another Charge of Discrimination and properly raised the retaliation issue in this court. In Nealon v. Stone, 958 F.2d 584 (4th Cir.

1992), the Fourth Circuit addressed this issue:

> All other circuits that have considered the issue have determined that a plaintiff may raise the retaliation claim for the first time in federal court. On consideration, we find these rationales persuasive and adopt this position. We believe that rule is the inevitable corollary of our "generally accepted principle that the scope of a Title VII lawsuit may extend to 'any kind of discrimination like or related to allegations contained in the charge and growing out of such allegations during the pendency of the case before the Commission.' " Hill v. Western Electric Co., 672 F.2d 381, 390 n. 6 (4th Cir.) (quoting Sanchez v. Standard Brands, Inc., 431 F.2d 455, 466 (5th Cir.1970)), cert. denied, 459 U.S. 981, 103 S.Ct. 318, 74 L.Ed.2d 294 (1982); see also EEOC v. General Electric Co., 532 F.2d 359, 373 (4th Cir.1976). The Seventh Circuit includes retaliation for the filing of an EEOC charge as discrimination "like or reasonably related to . . . and growing out of such allegations." Malhotra v. Cotter & Co., 885 F.2d 1305, 1312 (7th Cir.1989) (quotations omitted).

Id. at 590.

Defendant cites an unpublished, Fourth Circuit opinion, Brown v. Runyon, No. 96-2230, 1998 WL 85414 (4th Cir. February 27, 1998) as clarifying the holding in Nealon.  Specifically, Defendant asserts that Brown qualifies Nealon to apply only to cases in which the retaliatory act occurred during the pendency of the EEOC charge of discrimination.  In the present case, Plaintiff's second charge of discrimination was filed on July 1, 2004, and the EEOC issued its right to sue letter on September 27, 2004.  Therefore, Defendant argues, because the second EEOC charge was no longer pending when the alleged retaliatory action occurred in September of 2005, Plaintiff should have filed a third EEOC charge before bringing this action.

The Brown court noted that "Nealon's 'relation back' rule presupposes both that a retaliation count in a Title VII lawsuit be 'related to' and have 'grown out' of the EEO charge while the administrative charge remained pending." Id. at *3.  The Fourth Circuit has not expressly ruled on the question[2], and the pendency language in Nealon has been described as dicta.  See, e.g. Bishop v. Electrolux, No. 1:01-cv-00074, 2002 WL 653900, *3 (D.W.Va. April 19, 2002).

_____

[2] See Aronberg v. Walters, 755 F.2d 1114 (4th Cir. 1985).

Assuming, arguendo, that Plaintiff's retaliation claim based upon the Level One reprimand she received was not procedurally barred, it would fail on the merits. Plaintiff did not suffer a suspension, demotion or change in pay as a result of the reprimand. Kitchens Dep. at 24. In addition, a Level One reprimand has no effect on the promotion process. Id. Because, Plaintiff's Level One reprimand did not change the terms, conditions or benefits of her employment, See Von Gunten v. Maryland, 243 F.3d 858, 868 (4th Cir. 1997), summary judgment is appropriate on her claim of retaliation. See also Burlington Northern & Santa Fe Rwy. Co. v. White, 126 S.Ct. 2405, 2415 (2006) (holding that the change must be material).

Second, several of Plaintiff's claims for failure to promote and most of her non-promotion related claims are time-barred pursuant to National R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002). In Morgan, the United States Supreme Court held in relation to discrete discriminatory acts that "a litigant has up to . . . 300 days after the unlawful practice happened to file a charge with the EEOC." Id. at 110. Plaintiff filed her first EEOC charge on April 13, 2003. Therefore, any adverse employment action that occurred before June 17, 2002, that is, 300 days before she filed her charge, is time-barred. This includes the claims regarding the three Lieutenant positions for which Plaintiff applied in October of 2001, including the allegation that Captain Howard changed her MLA form, and her claims regarding the removal of her IRIS access, her removal from the South Carolina Highway Patrol Hiring and Promotion Boards, and her removal from the command post position at the Atlantic Beach bikefest.

Plaintiff's assertion that the continuing violation doctrine prevents these claims from being time-barred is without merit. In Williams v. Giant Food, Inc., 370 F.3d 423, 429 (4th Cir. 2004), the Fourth Circuit held that

> [t]his argument is foreclosed by [Morgan], which holds that an employee must file a charge of discrimination within the appropriate limitations period as to each discrete act of

discrimination that occurred. Such discrete acts of discrimination "are not actionable if time-barred, even when they are related to acts alleged in timely filed charges." Id. at 13. Because failure to promote is a discrete action of discrimination, the continuing violation doctrine does not apply here and cannot save Williams's untimely claims.

Other discrete acts identified by the Court in Morgan include termination, denial of transfer, and refusal to hire. Morgan, 536 U.S. at 114. Plaintiff's claims regarding the three Lieutenant positions for which she applied in October of 2001, and her claims regarding the removal of her IRIS access, her removal from the South Carolina Highway Patrol Hiring and Promotion Boards, and her removal from the command post position at the Atlantic Beach bikefest are all time-barred and must be dismissed.[3]

Third, the claims asserted in Plaintiff's first Charge of Discrimination are barred because she failed to file a Title VII lawsuit in this Court within ninety days of her receipt of her right to sue letter from the EEOC. See 42 U.S.C. § 2000e-5(f)(1). Plaintiff's first Charge of Discrimination was filed April 13, 2003, in which she asserted claims of discrimination relating to the denial of promotions to Leiutenant in December of 2002 and March of 2003. The EEOC issued the right to sue letter on September 23, 2003. Plaintiff did not file this action until December 22, 2004. Accordingly, Plaintiff's claims relating to her failure to receive those promotions fail as a matter of law and must be dismissed.

As a result of the procedural bars discussed above, the only Title VII claims remaining are Plaintiff's claims that she was denied the January 2004 promotion to First Sergeant and was removed from the Georgia Highway Patrol Promotions Board because of her race and gender.

Defendant describes the promotions process within the South Carolina Highway Patrol as

---

[3]Even if the removal of her IRIS access, her removal from the South Carolina Highway Patrol Hiring and Promotion Boards, and her removal from the command post position at the Atlantic Beach bikefest are not discrete acts, they do not rise to the level of adverse employment actions and, therefore, those claims fail on the merits.

follows:

When a commissioned officer position within the Department becomes available, the Colonel informs the Office of Promotion Policy Administration ("OPPA") of the vacancy, and the OPPA–after obtaining approval from the Department's Budget Office and Office of Human Resources ("OHR") – posts an announcement of the vacant position on the Department's intranet. [Kelley depo., p. 13; Roark depo., p. 59; Curtis depo., pp. 16-17]. Interested persons have seven business days within which to apply for the position after it is posted. [Kelley depo., p. 13; Curtis depo., pp. 16, 30]. Once a candidate applies for a position, the OPPA contacts OHR to gather information about the candidate's disciplinary history during the twelve months immediately preceding the application process. [Kitchens depo., pp. 23-24; Curtis depo., p. 79]. If a candidate has either been suspended or demoted within that twelve-month period, the candidate is automatically disqualified from consideration for the position. [Kitchens depo., pp. 23-24]. Any disciplinary action that was taken against a candidate more than twelve months before the candidate's application is submitted is not considered by the OPPA and does not factor into the promotion process. [Id.].

After the seven-day posting period is over, and the applications for a particular position have been received and initially screened by the OPPA, the Colonel designates a Promotion Review Board for the position ("the Board"), consisting of five commissioned officers of the Department from around the State.[4] [Kelley depo., p. 13; Kitchens depo., pp. 24-26]. The Board conducts a separate interview of each candidate for the position. [Kitchens depo., pp. 24-25; Cockfield depo., pp. 26-27]. The typical interview lasts approximately ten minutes. [Cockfield depo., p. 33; Curtis depo., p. 35].

During the interviews, candidates are asked five questions, one question from each member of the Board. [Cockfield depo., pp. 26-27; Kitchens depo., pp. 24-26; Curtis depo., pp. 37-38]. The Board members do not draft their own questions; rather, the questions are randomly selected by the OPPA from a pool of approximately 200 potential questions that have already been written and reviewed by a group of "subject matter experts" selected by the Colonel from within the Department. [Cockfield depo., pp. 27-28; Curtis depo., p. 36]. The Board members individually rate the candidates on their responses to each of the five questions.[5] [Cockfield depo., p. 27; Kitchens depo., pp. 24-26; Curtis depo., p. 38]. The highest and lowest ratings given to a candidate in response to each question are stricken from the candidate's interview score sheet to avoid any potential bias. [Cockfield depo.,

---

[4]Cockfield has been assigned to serve on approximately 40 Promotion Review Boards during her tenure with the Department. [Cockfield Depo. p. 31].

[5]The Board members have "mock" answers to the questions in front of them during the interview, and depending on whether the candidate addresses the points that are in the "mock" answer, the Board members assign a score of either zero, three, six, or nine to the candidate's response. [Cockfield depo., p. 30; Curtis depo., pp. 38-39].

p. 168; Curtis depo., p. 56].

After the interviews are conducted, the Board members submit their ratings to an administrator from the OPPA, who calculates each candidate's total interview score. [Curtis depo., p. 42; Kitchens depo., pp. 24-26]. The OPPA forwards the initial calculations to an internal auditor from the Department's Financial Division for review and verification. [Curtis depo., pp. 43-44; Kitchens depo., pp. 24-26]. The verified interview scores are then added to the candidate's overall rating sheet, which consists of six additional factors: education, longevity, time in position, Management Leadership Assessment ("MLA") rating, Employee Performance Management System ("EPMS") rating, and test scores. [Curtis depo., p. 17; Kitchens depo., pp. 24-26].

After the candidates' overall ratings have been tabulated, the OPPA prepares a list of the five candidates with the highest overall scores (or top 35% of the candidates, whichever is higher). [Kitchens depo., pp. 26-29; Curtis depo., p. 47]. The list of top candidates is then sent to the Colonel in alphabetical order, and the Colonel makes the decision from that list who to select for the position. [Kelley depo., pp. 13-14; Curtis depo., p. 47]. The Colonel is not able to select anyone who is not on the list of top candidates submitted to him by the OPPA. [Kelley depo., p. 57]. At all times relevant to this lawsuit, the Colonel did not consider scores, background information, or anything else related to the promotion process when selecting among the top candidates presented to him.[6] [Kitchens depo., p. 27; Curtis depo., p. 47; Kelley depo., p. 15]. The Colonel made his selection among the top candidates based in part on recommendations from the District Captain and in part on any experience the Colonel himself may have had with the candidates. [Kelley depo., pp. 15, 18].

Memorandum in Support of Defendant's Motion for Summary Judgment at 2-4 (footnotes in original) (Document # 31).

Plaintiff testified there is nothing about the promotion process on its face that she thinks is discriminatory or unfair. Plaintiff Dep. at 31-32.

In January of 2004, Plaintiff applied for a First Sergeant position. Plaintiff Dep. at 14. Farrell Scott, a black male, was the only other applicant. Id. at 165-66. The officers serving on the Promotions Review Board were Captain C.N. Williamson (black male), Captain M.L. (Melvin)

---

[6]This part of the promotion process changed in 5 March 2004, after James Schweitzer became the new Director of the Department. [Roark depo., pp. 11-14]. Under the new process, the Colonel has access to interview scores and background information when making his decisions among the top candidates presented to him. [Id., pp. 12-13; Curtis depo., pp. 45-47].

Howard (black male), Lieutenant R.H. Rabon (white male), First Sergeant J.O. Tucker (Hispanic male), and First Sergeant H.B. Dubose (black male). Id.

Plaintiff's interview score was 35 with an overall rating of 68, while Scott's interview score was 42 with an overall rating of 75. Curtis Dep., Ex. 11.; Kitchen Dep. at 47. Plaintiff points to the Interview Board Rating sheets as evidence that Scott's scores were manipulated to increase his score. See Curtis Dep., Ex. 2. Captain Howard changed two of his scores for Scott from 6 to 9, and Lieutenant Rabon changed one of his scores for Scott from 6 to 9. Id. None of Plaintiff's scores were changed. According to Plaintiff, if the total score for Scott had been calculated with the original scores, he would have received four less points. Even in that event, Scott's score still would have been higher than Plaintiff's score.

Furthermore, as described above, the scores are used only for the purpose of compiling a list of the five candidates with the highest overall scores. The candidates are listed in alphabetical order and the list is then presented to the Colonel, who must choose a candidate from that list for the position. In making his decision, the Colonel does not review the scores, background information, or any other information collected during the interview process. Therefore, because Scott was the only other candidate for the position other than Plaintiff, both names were submitted to Colonel Roark for his consideration. Therefore, the overall scores had no effect on the ultimate promotion decision.

Colonel Roark made his selection based on the recommendation from Captain Howard, the District Captain. Roark Dep. at 21-24. In his deposition, Colonel Roark described his discussion with Captain Howard:

> [W]e talked about the necessity of the individual that received that position . . . to be able to analyze problems quickly, to resolve problems, have the ability to work within the structure to ensure that he or she would be getting the best from their employees. One would have to be someone that has a strong, strong work ethic,

> someone that's familiar with the inner workings of Horry County as far as it involving a hurricane evacuation and have the ability to take on additional responsibilities. Through the conversation that I had with Captain Howard I was convinced that Sergeant Scott possessed all those abilities.

Id. at 21. In response to the question of whether Plaintiff possessed those same abilities, Colonel Roark indicated that, according to his conversation with Captain Howard, Plaintiff did not possess those abilities to the same degree as Scott. Id. at 23.

Captain Howard described his reasons for recommending Scott rather than Plaintiff for the promotion:

> Scott is a college graduate; I think he's an accounting or finance major or whatever. This, in my view, Horry County, is probably the most demanding post in Troop 5. I thought it was important that the first sergeant be a person who had strong management skills. Again, the cohesion was a big thing for me. He was a very, very hard worker, recognized and applauded by his people for being very hands-on, worked very hard, way beyond the normal hours. In fact, there were occasions when I had to more or less order him to go home. There are a large number of crashes that occur in Horry County. We have a specialized reconstruction team. He was one of the first people who were trained in that area, very, very qualified, highly skilled in terms of specialized accident reconstruction. Along with those management and leadership skills that I thought he exhibited, in addition to the specialized accident training, my thinking was in terms of the large number of crashes that occur here. If you have expertise in terms of reconstructing crashes, then you would be very, very, very, very helpful in terms of preventing crashes. He had all those skills. I thought he was the better candidate.

Howard Dep. at 82-83.

There are two methods of proving a case of intentional discrimination under Title VII: the method set forth in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) (mixed-motive) and the method established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)(pretext).

Under the McDonnell Douglas[7] analysis, plaintiff has the initial burden of demonstrating a

---

[7] The McDonnell Douglas analysis was refined in St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993), and Reeves v. Sanderson Plumbing Products, Inc., – U.S. –, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

prima facie case of discrimination.  In order to prove a prima facie case of discrimination for failure to promote, a plaintiff must prove that (1) she is a member of a protected group; (2) she applied for the position in question; (3) she was qualified for the position; and (4) she was rejected for the position under circumstances giving rise to an inference of unlawful discrimination.  Taylor v. Virginia Union University, 193 F. 3d 219, 230 (4th Cir. 1999).  An inference of discrimination is established when a person outside the protected class was chosen for the position.  Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994).

Once plaintiff has established a prima facie case, the burden shifts to the defendant to produce a legitimate, nondiscriminatory reason for the denial of the promotion.  Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 ((1981).  This is merely a burden of production, not of persuasion.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).

Once the defendant has met its burden of production by producing its legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination vel non."  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000)(citing Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)).  In other words, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by the defendant is not its true reasons, but were pretext for discrimination.  Reeves, 530 U.S. at 143.   In failure to promote cases, an employer may rebut the plaintiff's prima facie case by demonstrating that the selected individual was "better qualified for the position."  Carter v. Ball, 33 F.3d 450, 458 (4th Cir. 1994).  During all of the burden shifting scheme set forth in McDonald Douglas, the ultimate burden of proving that defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.  Plaintiff has the ultimate burden of presenting evidence from which a reasonable jury could conclude defendant intentionally discriminated against her based on race or gender.

Plaintiff meets the relatively easy burden of establishing a prima facie case. She is a white female, she applied for the position of First Sergeant, Colonel Roark testified that she was qualified for the position, Roark Dep. at 30-31, and the position was filled by Scott, who is outside her protected class.

Defendant also meets the relatively easy burden of producing a legitimate, nondiscriminatory reason for promoting Scott rather than Plaintiff for the First Sergeant position. Colonel Roark, who made the ultimate decision to promote Scott, indicated that, among other things, Scott had a "stronger work ethic, better knowledge base, and better abilities." Roark Dep. at 22-23. Captain Howard stated that, as opposed to Plaintiff, Scott had a college degree and was highly skilled in terms of specialized accident reconstruction. Howard Dep. at 82-83. Captain Howard also stated that "Scott exhibited greater leadership and management skills" than Plaintiff. Id. Accordingly, the burden shifts back to Plaintiff to prove that Defendant's articulated reason for promoting Scott over her is pretext for discrimination.

Plaintiff may show pretext by establishing (1) she is more qualified, or (2) regardless of the qualifications, the explanation is not the real reason for the adverse action. Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 269 (4th Cir. 2005); Dennis v. Columbia Colleton Med.Ctr., Inc., 290 F.3d 639, 648 n.4 (4th Cir. 2002).

Plaintiff has failed to create a genuine issue of fact as to whether she is more qualified than Scott for the position of First Sergeant. Although she argues that she is more qualified because she has been on the patrol longer and has served as a Sergeant "ten time as long as Scott," Plaintiff Aff. ¶ E, Colonel Roark testified that he does not consider seniority when deciding to promote a candidate. Roark Dep. at 25. Captain Howard stated that he would consider seniority when making a recommendation for a promotion only when all other factors between candidates were equal and

14

that he did not believe Plaintiff's abilities were equal to those of Scott.  Howard Dep. at 89.  Plaintiff offers no evidence to dispute this testimony.  In sum, Plaintiff argues that she was more qualified than Scott simply because she served as Sergeant longer than Scott.  She fails to address the fact that both Colonel Roark and Captain Howard testified that Scott possessed better leadership and management skills, had a college degree, and had specialized accident reconstruction training.  She offers no evidence that she possessed the same qualities to a greater degree than Scott or that such qualities were irrelevant to the position of First Sergeant.  As such, Plaintiff offers insufficient evidence to establish that she is more qualified than Scott.  While Plaintiff presents her opinion as to what the relevant qualification factors should be and her opinion as to whom was more qualified, it is not within her province to establish the criteria.  Anderson v. Westinghouse, 406 F.3d 248, 269 (4th Cir. 2005).  Furthermore, "this Court does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination ...."  DeJarnette v. Corning, Inc., 133 F.3d 293, 299(4th Cir. 1998).

Plaintiff also fails to establish that Defendant's explanation for promoting Scott rather than her is not the real reason but that her gender or race is the more likely reason.  Plaintiff asserts in her deposition that she is unaware of anything that would make her think that Colonel Roark might discriminate against her.  Plaintiff Dep. at 41.  However, according to Plaintiff, Captain Howard once made a comment in front of her and other female officers that several male officers were "acting like they were on the rag," which offended her and the other female officers.  Plaintiff Dep. at 59.  However, "simple teasing, off-hand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher v. Boca

Raton, 524 U.S. 775, 787-88 (1998).[8]

Any racial bias alleged by Plaintiff must come from a relevant decisionmaker to sustain a cause of action for failure to promote. Hill v. Lockheed Martin Logistics Mgmt, Inc., 354 F.3d 277, 291 (4th Cir. 2004). In Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 151-52 (2000), the Supreme Court held that the person allegedly acting pursuant to a discriminatory animus need not be the "formal decisionmaker" to impose liability upon an employer for an adverse employment action. The Fourth Circuit elaborated on the holding in Reeves: "When a formal decisionmaker acts merely as a cat's paw for or rubber-stamps a decision, report, or recommendation actually made by a subordinate, it is not inconsistent to say that the subordinate is the actual decisionmaker or the one principally responsible for the contested employment decision . . . ." Hill, 354 F.3d at 290. The Hill court concluded its analysis by providing,

> In sum, to survive summary judgment, an aggrieved employee who rests a discrimination claim under Title VII . . . upon discriminatory motivations of a subordinate employee must come forward with sufficient evidence that the subordinate employee possessed such authority as to be viewed as the one principally responsible for the decision of the actual decisionmaker for the employer.

Id. at 291.

It is undisputed that Colonel Roark based his decision to promote Scott rather than Plaintiff solely on the information provided by and the recommendation of Captain Howard. The record reveals that Colonel Roark and Captain Howard discussed the qualifications and necessities of the job. It is also clear that Colonel Roark had no independent knowledge of Scott or Plaintiff. Furthermore, the record reveals that Colonel Roark usually relied on the recommendation of the

---

[8]Plaintiff also states in her deposition that one officer told her that Captain Howard would never allow a female to be in charge of Horry County. Plaintiff Dep. at 68-69. She further states that Scott agreed with her when she later made the statement to him that Captain Howard would never recommend a woman for the First Sergeant position. Id. Plaintiff fails to provide a foundation for the admissibility of these hearsay statements.

Captain to make his decision.[9]

This case presents the extreme of the parameters of employer liability under agency principles. This case does not involve a supervisor who disciplines an employee under clear authority to do so from the employer. The record reveals that the Director of Defendant actually has the formal authority to promote employees. Apparently, as agreed by the parties, the Director delegates that authority to the Colonel.[10] The issue in this case is whether or not Colonel Roark has delegated that authority to Captain Howard. In other words, did Colonel Roark simply act as Captain Howard's cats-paw and rubber-stamp his recommendation? Had Captain Howard simply provided a single name to Colonel Roark and Colonel Roark passed the recommendation on with no discussion, he clearly would be acting as Captain Howard's cats-paw. Conversely, had Colonel Roark accepted Captain Howard's recommendation along with conducting his own independent examination and review of the candidates' qualifications, he likely would not be rubber-stamping the recommendation of Captain Howard.

Considering all of the undisputed facts, Colonel Roark did not make an independent decision and Captain Howard was principally responsible for the decision to promote Scott instead of Plaintiff. Accordingly, Defendant is not entitled to summary judgment on the issue of the relevant decisionmaker.

Nonetheless, as discussed above, Defendant has presented its legitimate, nondiscriminatory reasons for its decision and Plaintiff fails to show pretext. No reasonable juror could conclude that Plaintiff's gender was a factor in the decision to promote Scott instead of Plaintiff.

---

[9]Colonel Roark testified that he did not accept Captain Howard's recommendation on a prior occasion. See Roark Dep. at 18-19.

[10]In other words, apparently, the Director rubber-stamps the recommendation of the Colonel.

17

Plaintiff's only other Title VII claim to survive the procedural bars is her claim that she was removed from the Georgia Highway Patrol Promotions Board because of her race and gender. However, this claim fails on the merits because her removal from the board did not adversely affect the "terms, conditions, or benefits" of her employment.  Von Gunten, 243 F.3d at 865.  Therefore, summary judgment is appropriate on this claim.

### Section 1981 Claims

Defendant argues that Plaintiff's § 1981 claims fail on three levels because (1) Defendant is entitled to Eleventh Amendment immunity, (2) 42 U.S.C. § 1983 provides the exclusive remedy for any violation of her rights protected under § 1981, and (3) Plaintiff has failed to create a genuine issue of material fact as to these claims.

The Eleventh Amendment to the United States Constitution prohibits "any suit . . . against one of the United States by citizens of another State," U.S. Const. Amend. XI, and (as interpreted) by its own citizens, Hans v. Louisiana, 134 U.S. 1 (1890); Seminole Tribe v. Florida, 517 U.S. 44, 54 (1996).  This immunity extends to suits against state agencies.  Pennhurst State School and Hospital v. Halderman, 465 U.S. 89, 100 (1984); Gray v. Laws, 51 F.3d 426, 430 (4th Cir. 1995). Because Defendant is a state agency, it is immune to suit on Plaintiff's § 1981 claims unless Congress has abrogated immunity in regards to these claims or Defendant has consented to suit.

The language in § 1981 contains no congressional waiver of Eleventh Amendment immunity. Singletary v. Missouri Department of Corrections, 423 F.3d 886, 890 (8th Cir. 2005); Wallace v. Texas Tech Univ., 80 F.3d 1042, 1046 (5th Cir. 1996); Mitchell v. Los Angeles Cmty. Coll. Dist., 861 F.2d 198, 201 (9th Cir. 1988); Freeman v. Michigan Dept. of State, 808 F.2d 1174, 1178 (6th Cir. 1987); Rucker v. Higher Educ. Aids Bd., 669 F.2d 1179, 1181 (7th Cir. 1982); see also Huang v. Board of Governors of Univ. of North Carolina, 902 F.2d 1134, 1138 (4th Cir. 1990) (indirectly

18

recognizing Eleventh Amendment immunity in § 1981 cases); <u>Herron v. Virginia Com. University</u>, 366 F. Supp. 2d 355, 363-64 (E.D. Va. 2004); <u>Allen v. College of William & Mary</u>, 245 F. Supp. 2d 777, 790 (E.D. Va. 2003); Demuren v. Old Dominion University, 33 F. Supp. 2d 469, 474 (E.D. Va. 1999); <u>Gilyard v. South Carolina Department of Youth Services</u>, 667 F. Supp. 266, 276 (D.S.C. 1985).

In addition, the state has not consented to suit or waived its Eleventh Amendment immunity in § 1981 cases. A state consents to federal court jurisdiction, thereby waiving its sovereign immunity, only "by the most express language or by such overwhelming implications from the text as to leave no room for any other reasonable construction." <u>Edelman v. Jordan</u>, 415 U.S. 651, 673 (1974). South Carolina's Tort Claims Act provides that "[n]othing in this chapter is construed as a waiver of the state's or political subdivision's immunity from suit in federal court under the Eleventh Amendment to the Constitution of the United States nor as consent to be sued in any state court beyond the boundaries of the State of South Carolina." S.C. Code Ann. § 15-78-20(e) (Supp. 2002). Therefore, not only is there no express consent to suit by the state, the language set forth in the South Carolina Tort Claims Act expressly denies any waiver of the state's Eleventh Amendment immunity in federal court.

Plaintiff contends that Defendant has waived Eleventh Amendment immunity by failing to assert it as an affirmative defense pursuant to Rule 8(c), Fed.R.Civ.P., or by failing to raise the issue in its previously filed Motion to Dismiss. The Fourth Circuit has noted that "Eleventh Amendment immunity has attributes of both subject-matter jurisdiction and personal jurisdiction." <u>Constantine v. Rectors and Visitors of George Mason University</u>, 411 F.3d 474, 480 (4th Cir. 2005). Thus, like personal jurisdiction, Eleventh Amendment immunity may be waived by the state, but, like subject-matter jurisdiction, the immunity may be raised at any time during the litigation. <u>Id.</u> at 481.

19

Therefore, even though it is possible for Defendant to waive Eleventh Amendment immunity, it has not done so by raising it for the first time in its Motion for Summary Judgment.

Even so, Plaintiff also argues that Defendant has waived its immunity by removing the case from state court, thereby voluntarily invoking the federal court's jurisdiction.  In Lapides v. Board of Regents of the University of Georgia, 535 U.S. 613 (2002), the Supreme Court noted,

> It would seem anomalous or inconsistent for a State both (1) to invoke federal jurisdiction, thereby contending that the "Judicial power of the United States" extends to the case at hand, and (2) to claim Eleventh Amendment immunity, thereby denying that the "Judicial power of the United States" extends to the case at hand. And a Constitution that permitted States to follow their litigation interests by freely asserting both claims in the same case could generate seriously unfair results. Thus, it is not surprising that more than a century ago this Court indicated that a State's voluntary appearance in federal court amounted to a waiver of its Eleventh Amendment immunity.  Clark v. Barnard, 108 U.S. 436, 447, 2 S.Ct. 878, 27 L.Ed. 780 (1883) (State's "voluntary appearance" in federal court as an intervenor avoids Eleventh Amendment inquiry).
>
> * * *
>
> In this case, the State was brought involuntarily into the case as a defendant in the original state-court proceedings. But the State then voluntarily agreed to remove the case to federal court. See 28 U.S.C. § 1446(a); Chicago, R.I. & P.R. Co. v. Martin, 178 U.S. 245, 248, 20 S.Ct. 854, 44 L.Ed. 1055 (1900) (removal requires the consent of all defendants). In doing so, it voluntarily invoked the federal court's jurisdiction. And unless we are to abandon the general principle just stated, or unless there is something special about removal or about this case, the general legal principle requiring waiver ought to apply.

Id. at 619-20.  The Court held that the state waived its Eleventh Amendment immunity by removing the action to federal court.

However, the Lapides Court specifically limited its holding to "the context of state-law claims, in respect to which the State has explicitly waived immunity from state-court proceedings." Id. at 617.  In Lapides, the defendant removed the case to federal court and then sought Eleventh Amendment immunity on the pendant state law claims asserted by the plaintiff.  Id. at 616.  The state's Tort Claims Act waived sovereign immunity for state law claims brought in state court.  Id.

20

The Court determined that the defendant could not escape that waiver simply by removing the case to federal court.

The Fourth Circuit has recognized the limitation of the holding in Lapides:

We believe the district court read the rule of Lapides too broadly. Lapides addresses whether a state that removes an action to federal court having already consented to suit in its own courts can invoke Eleventh Amendment immunity; it does not resolve whether a state that has not consented to suit in its own courts maintains either the broader concept of sovereign immunity or Eleventh Amendment immunity upon voluntarily removing a case to federal court.

Stewart v. North Carolina, 393 F.3d 484, 488 (4th Cir. 2005). In further discussion of Lapides, the Stewart court noted that "[b]ecause Georgia had already consented to suit in its own courts, the only issue was whether the state could regain immunity by removing the case to federal court and invoking the Eleventh Amendment." Id.[11]

In the present case, Defendant seeks Eleventh Amendment immunity as to Plaintiff's federal claims brought pursuant to 42 U.S.C. § 1981, not on her Title VII claims, for which immunity clearly has been waived within the statutory language of Title VII, nor on her state cause of action for breach of contract. Defendant did not waive immunity (subject matter jurisdiction) by removing the action to this Court. Accordingly, Plaintiff's claims brought pursuant to § 1981 should be dismissed.

Even assuming a waiver of jurisdiction, Plaintiff's § 1981 claim fails. Defendant argues that Plaintiff's § 1981 claim is foreclosed because § 1983 provides the exclusive remedy for any violation of Plaintiff's rights protected under § 1981, and she failed to assert a cause of action pursuant to § 1983. In Jett v. Dallas Independent School District, 491 U.S. 701, 731 (1989), the United States Supreme Court provided that "Congress intended that the explicit remedial provisions of § 1983 be

_____

[11]It is important to note that Stewart did not specifically address "the effect, if any, of voluntary removal on the availability of Eleventh Amendment immunity where the State has not already consented to suit in its own courts." Id. at 490 n.5. Stewart is cited here only for the court's recognition of the limitation of the holding in Lapides.

controlling in the context of damages actions brought against state actors alleging violation of the rights declared in § 1981." However, several courts have held that this principle was superseded by the Civil Rights Act of 1991, which amended § 1981.

The Civil Rights Act of 1991 amended § 1981, inter alia, by adding subsection (c), which provides, "[t]he rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law." Several courts have held that subsection (c) expressly provides recovery for violations of § 1981 by state actors such that plaintiffs no longer need to rely on the remedial provisions of § 1983 as once required by Jett. See, e.g., Johnakin v. City of Philadelphia, No. Civ. A. 95-1588, 1996 WL 18821 at *4 (E.D.Pa., Jan.18, 1996); Robinson v. Town of Colonie, 878 F.Supp. 387, 405, n. 13 (N.D.N.Y.1995); La Compania Ocho, Inc. v. U.S. Forest Serv., 874 F.Supp. 1242, 1251 (D.N.M.1995); Gallardo v. Bd. of County Commissioners, 857 F.Supp. 783, 786 (D.Kan.1994); Morris v. Kansas Dep't of Revenue, 849 F.Supp. 1421, 1426 (D.Kan.1994); Arnett v. Davis County Sch. Dist., No. 92- C-988W, 1993 WL 434053 at *5 n. 8 (D.Utah, April 5, 1993); Ford v. City of Rockford, No. 88 C 20323, 1992 WL 309603 at *2 (N.D.Ill., Oct.15, 1992).

In opposition to this argument, Defendant cites to Dennis v. County of Fairfax, 55 F.3d 151 (4th Cir. 1995), in which the Fourth Circuit explicitly stated that the Civil Rights Act of 1991 did not overrule Jett:

> We do not believe that this aspect of Jett was affected by the Civil Rights Act of 1991, which added subsection (c) to § 1981. . . . Some district courts have asserted, largely without explanation, to the contrary. See Robinson v. Town of Colonie, 878 F. Supp. 387 (N.D.N.Y. 1995); LaCompania Ocho, Inc. v. U.S. Forest Serv., 874 F. Supp. 1242 (D.N.M. 1995). We think the correct reading of the amendment is found in Philippeaux v. North Central Bronx Hosp., 871 F. Supp. 640 (S.D.N.Y.1994), which recognizes that subsection (c) did not purport to overrule Jett's holding with respect to municipal liability but only to codify Runyun v. McCrary, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976).

Id. at 157 n.1.  Citing Dennis, the court in Norris v. City of Anderson, 125 F.Supp.2d 759, 771 n.2 (D.S.C. 2000), stated that "Plaintiff's failure to plead a violation § 1983 deprives this Court of subject matter jurisdiction over any claims Plaintiff may have under § 1981."  Plaintiff argues that dismissal of its case based upon a "hyper-technical failure to mention Section 1983" would run afoul of Rule 8(f), Fed.R.Civ.P.  Plaintiff's Response to Defendant's Motion for Summary Judgment at 19.  A review of Plaintiff's complaint reveals that she did not plead the claim under § 1983 and the complaint does not meet the liberal standards of Rule 8(f).    However, Plaintiff requests leave to amend its complaint to note the application of § 1983 pursuant to Rule 15(a), Fed. R. Civil P.

There is authority that a party must satisfy the good cause standard of Rule 16(b), Fed.R.Civ.P., before addressing the merits under Rule 15(a).  Dilmar Oil Co., Inc. V. Federated Mt. Ins. Co., 986 F.Supp. 959 (D.S.C. 1997).[12]  Dilmar clearly holds that before a party may attempt to amend a pleading pursuant to Rule 15(a), they must satisfy the good cause standard contained in Rule 16(b).  The Fourth Circuit has not addressed the issue in a published opinion. But see Wall v. Fruehauf Trailer Services, 2005 WL 428781 (4th Cir. 2005)(unpublished)(considering Rule 15(a) standard in conjunction with Rule 16(b) standard); In re Lone Star Industries, Inc.,Concrete R. R. Cross Ties Litigation, 1994 WL 118475 (4th 1994)(unpublished)(Rule 16(b) standard relaxed when addressing a motion filed pursuant to Rule 15(a)); Naden v. Saga Software, Inc., 2001 WL 672071 (4th Cir. 1991)(unpublished)(expressing no view on the applicability of Rule 16(b) to a motion under Rule 15(a));  Essential Housing Management, Inc. v. Walker, 1998 WL 559349 (4th Cir. 1998)(unpublished) (applying Rule 16(b) standard before entertaining standard under Rule 15(a)); James River-Norwalk, Inc. v. Burch Roofing Co., Inc., (No. 88-2968)(4th Cir.

_____

[12]  "A scheduling order is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril." Dilmar Oil Co., Inc., 986 F.Supp. at 980 (citing Jordan v. E.I. du Pont de Nemours, 867 F.Supp. 1238, 1250 (D.S.C.1994)).

1989)(unpublished)(Rule 16(b) is irrelevant to analysis under Rule 15(a)); "Modification of Pretrial Order", 28 Fed. Proc. §64:33 (Thomson/West 2005).

Plaintiff has failed to show good cause as required by Rule 16(b).  However, even if an analysis of Rule 16(b) is not necessary before addressing Rule 15(a), Plaintiff's request to amend her complaint is still denied because the requested amendment would be futile.  Rule 15(a) provides that leave to amend a complaint should be "freely given when justice so requires."  "The law is well-settled 'that leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." Edwards v. City of Goldsboro, 178 F.3d 231, 242 (4th Cir. 1999)(citing Foman v. Davis, 371 U.S. 178 (1962) and quoting Johnson v. Oroweat Foods Co., 785 F. 2d 503,509-10 (4th Cir. 1986) (holding that delay alone is not sufficient to deny leave to amend, but must be accompanied by prejudice, bad faith, or futility)).  Plaintiff's requested amendment to her complaint would be futile in this case because a state agency such as Defendant is not a "person" within the meaning of § 1983 and is, therefore, not subject to suit under that statute.  See Will v. Michigan Department of State Police, 491 U.S. 58, 70-71 (1989).  Therefore, summary judgment is appropriate on Plaintiff's § 1981 claims.

***Breach of Contract Claim***

If the Court accepts this report and recommendation, then the original federal jurisdiction claims will be dismissed.  Title 28 U.S.C. § 1367(c)(3) provides, in pertinent part, "[t]he district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ." The Fourth Circuit has recognized that "trial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished." Shanaghan v. Cahill, 58 F.3d 106, 110 (4th

Cir.1995) (holding district court did not abuse its discretion in declining to retain jurisdiction over the state law claims). <u>See</u> <u>also</u>, <u>e.g.</u>, <u>United Mine Workers of Am. v. Gibbs</u>, 383 U.S. 715, 726-27, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); <u>Revene v. Charles County Comm'rs</u>, 882 F.2d 870, 875 (4th Cir.1989).  Therefore, the undersigned recommends that the Court decline to retain jurisdiction over Plaintiff's state law cause of action for breach of contract.

<u>**CONCLUSION**</u>

In light of the above analysis, it is recommended that Defendant's Motion for Summary Judgment (Document # 31) be granted as to Plaintiff's Title VII and § 1981 claims and that the Court decline to exercise jurisdiction over Plaintiff's state law cause of action for breach of contract.

                                         s/Thomas E. Rogers, III
                                        Thomas E. Rogers, III
                                        United States Magistrate Judge

February 26, 2007
Florence, South Carolina

**The parties' attention is directed to the important notice contained of the following page.**